**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4294-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

THOR T. FREY, a/k/a
LACOUR TEDDY, and
THEODORE LACOUR,

     Defendant-Appellant.

_____

Submitted October 25, 2021 – Decided November 18, 2021

Before Judges Fasciale and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Warren County, Indictment No. 08-01-0024.

Joseph E. Krakora, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, on the brief).

James L. Pfeiffer, Warren County Prosecutor, attorney for respondent (Dit Mosco, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Thor T. Frey appeals from an order denying his post-conviction relief (PCR) petition without an evidentiary hearing. He contends: his trial counsel was ineffective by failing to investigate and obtain exculpatory evidence and by failing to present exculpatory evidence at trial; the PCR court erred by failing to conduct an evidentiary hearing and by denying his motion for a new trial based on newly discovered evidence; and he is entitled to PCR because the State improperly withheld the production of Brady[1] material. Unpersuaded by defendant's arguments, we affirm.

I.

In 2006, a grand jury indicted defendant for first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); second-degree robbery, N.J.S.A. 2C:15-1(a)(1); third-degree burglary, N.J.S.A. 2C:18-2; and fourth-degree criminal mischief, N.J.S.A. 2C:17-3(a)(1). A jury convicted defendant of the charges following a 2009 trial, and we reversed his convictions and remanded for a new trial because the court failed to properly instruct the jury on lesser-included offenses. State

---

[1] Brady v. Maryland, 373 U.S. 83 (1963). In Brady, the United States Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87.

A-4294-19

v. Frey (Frey I), No. A-1716-09 (App. Div. Aug. 15, 2011). The Supreme Court denied the State's petition for certification. State v. Frey, 209 N.J. 232 (2012).

At his retrial, a jury again convicted defendant of the charges in the indictment. Prior to sentencing, the court denied defendant's motion for a new trial based on newly discovered evidence and for judgment of acquittal. The court imposed an aggregate forty-year extended term sentence, see N.J.S.A. 2C:44-3, subject to the requirements of the No Early Release Act, N.J.S.A. 2C:43-7.2. We affirmed defendant's conviction and sentence, State v. Frey (Frey II), No. A-4939-12 (App. Div. Apr. 21, 2016) (slip op. at 33), and the Supreme Court denied defendant's petition for certification, State v. Frey, 227 N.J. 252 (2016).

In our decision on defendant's direct appeal following his retrial, we summarized the evidence presented. See Frey II, slip op. 2-7. To provide context for the arguments defendant presently makes on his appeal from the order denying his PCR petition, we again summarize the pertinent evidence presented at the retrial as well as additional facts asserted in support of his PCR petition.

On August 18, 2006, seventy-five-year-old Mary Bostian was found dead in a second-floor bedroom of her Phillipsburg home. The Warren County

A-4294-19

medical examiner determined Ms. Bostian had been beaten, asphyxiated, and suffocated to death between 2:30 a.m. and 8:00 a.m. that day.

Investigators found a screwdriver, a hammer, a tire iron, and Ms. Bostian's purse on the living room floor. A medallion, later described as a Thor's hammer medallion, was also found on the floor.

Ms. Bostian's son, John Counterman, told investigators he kept a fireproof safe secured by a wood frame in a bedroom closet at Ms. Bostian's home. Counterman said the safe contained a gun, business records, approximately $800 in coins, and about $25,000. The safe had been torn from its frame and removed from Ms. Bostian's home. Counterman testified the safe could not be moved by a single person because of its weight. The safe weighed about 146 pounds empty and the coins inside it weighed an additional forty or fifty pounds.

Lieutenant Thomas Carroll of the Warren County Prosecutor's Office made a sketch of the medallion found on the living room floor. He showed the sketch to Counterman, who immediately recognized it as depicting a "Thor's hammer." Counterman said he had the same medallion hanging from his vehicle's rearview mirror, and he showed Lieutenant Carroll the medallion in the vehicle.

4

Defendant's estranged wife, Naomi Frey, was dating and living with Counterman at the time of Ms. Bostian's murder. She was present when Lieutenant Carroll showed Counterman the sketch, and she recognized the medallion. She explained she had purchased two of the medallions, like the one depicted in the sketch, from a catalog she later turned over to police. She testified she told the investigators she could have purchased more than two medallions, but no more than six.

Naomi Frey testified she gave one of the medallions to Counterman – the one hanging from the rearview mirror of his vehicle – and the other to defendant's sister for her to give to defendant. Naomi Frey later received a thank-you note from defendant for the gift. At trial, Ms. Frey identified a photograph of defendant, showing him wearing the medallion on July 26, 2006, three weeks before Ms. Bostian's murder.

The officers sought to locate defendant and learned he lived in Bangor, Pennsylvania with his then-girlfriend Robin O'Grady, the ex-wife of Donald O'Grady. On August 23, 2006, Lieutenant Carroll spoke with Robin O'Grady at her Pennsylvania home, but defendant was not there.

Simultaneous to the investigation of defendant's involvement in Ms. Bostian's August 18, 2006 murder, Bangor, Pennsylvania police were

investigating defendant's involvement in a July 7, 2006 burglary. The circumstances surrounding the Pennsylvania investigation are described in police reports included in defendant's supplemental appendix on appeal.

The reports state that at 3:31 a.m. on July 7, 2006, Officers Richard Ruck and Scott Trethaway of the Bangor Police Department responded to a burglary at a convenience store and observed muddy footprints throughout the store. Two men were seen fleeing the store while the officers were inside. Witnesses described the two men, one in a dark colored hooded sweatshirt, and the witnesses pointed out the direction in which the two men fled. Officer Trethaway saw the men, observed one to be in a dark colored sweatshirt, and he pursued them to a fence but then lost sight of them. A K-9 unit led the officers to an apartment, where defendant, sweating profusely, answered the door. According to the report, defendant was evasive in his responses to Officer Trethaway's questions. Donald O'Grady and two other men were at the apartment with defendant.

Defendant consented to Officer Trethaway's request to "walk through [the] apartment," and, with defendant's permission, the officers obtained shoes "caked with fresh mud" and found a red hooded sweatshirt on a banister that was "exactly like the one observed and reported by witnesses." Evidence, including

6

"fingerprints, [and] photographs," was also gathered from the burglary scene. Defendant and the three men found in his apartment were brought to the Bangor Police Department for fingerprinting, and the evidence was "logged and secured" after Officer Trethaway returned from the scene.

Also included in defendant's supplemental appendix is an August 19, 2006 report from Officer Kenneth Decker of the Phillipsburg, New Jersey, Police Department. He traveled to Bangor, Pennsylvania on that date, as part of the investigation of Ms. Bostian's murder. He conducted surveillance of defendant's residence and exchanged information regarding defendant with officers from the Bangor Police Department, including Officer Trethaway.

On August 21, 2006, Officer Trethaway submitted an affidavit of probable cause in support of a request for an arrest warrant for defendant for the July 7, 2006 burglary.[2] That same day, a Northampton County, Pennsylvania judge issued a warrant for defendant's arrest on the burglary charge.

On August 24, 2006, the Warren County Prosecutor's Officer requested assistance from Pennsylvania State Trooper James Bruchak in locating

---

[2] Defendant's appendix includes only the first page of the probable cause affidavit. The affidavit indicates it is "[c]ontinued" on at least one additional page, but no additional pages are included in the appendix. See R. 2:6-1(a)(1)(I) (requiring the appellant to include in the appendix on appeal "such other parts of the record . . . as are essential to the proper consideration of the issues").

defendant and Donald O'Grady who, at that point, were persons of interest in Ms. Bostian's homicide. Trooper Bruchak and Corporal Gerald Walsh checked hotels and motels in the Northampton County, Pennsylvania area to locate defendant and O'Grady.

At the Travel Inn of Wind Gap motel, Trooper Bruchak and Corporal Walsh showed a maid a picture of defendant; she recognized defendant and pointed to a motel room. The officers noticed the door to the room was open when it had been closed as they had arrived at the motel. They concluded that whoever had been in the room exited after their arrival, and they determined the room was empty.

A local police officer with a canine arrived at the motel and led the officers to nearby woods where they found defendant hiding. Defendant was arrested pursuant to the arrest warrant issued for the Pennsylvania burglary charge. A Pennsylvania State Trooper found a sock containing $2,400 in the woods near where defendant was apprehended.

While officers continued to search the woods for evidence, a car driven by Daniel Stracqaudaine and containing O'Grady arrived at the motel's parking lot. They were removed from the vehicle. Drugs were found on Stracqaudaine

A-4294-19

and he was taken into custody.  Drugs were also found on O'Grady, who was also taken into custody.

Stracqaudaine led officers to a location where the safe stolen from Ms. Bostian's home was found.  Stracqaudaine later testified he had driven O'Grady there earlier in the day so O'Grady could collect items from the safe. Stracqaudaine also testified defendant and O'Grady appeared to have money while staying at the motel, he tattooed both of them while they were staying at the motel, and they paid him over $600 for the tattoos.

Lieutenant Stephen Speirs of the Warren County Prosecutor's Office traveled to Pennsylvania to interview defendant and O'Grady after they were taken into custody.  Initially, defendant did not want his interrogation tape recorded.  After Speirs read defendant his Miranda[3] rights, defendant told Lieutenant Speirs he had been with O'Grady the night Ms. Bostian was murdered and the safe was stolen.  Defendant said he did not enter the house, claiming he was heavily intoxicated and had passed out in Ms. Bostian's yard.

Defendant later requested to speak with Lieutenant Speirs again and agreed to have his statement recorded.  Defendant was again advised of his Miranda rights.  In his recorded statement, defendant said he was with O'Grady

---

[3]  Miranda v. Arizona, 284 U.S. 436 (1966).

on the night of August 17, 2006, and they had been drinking and smoking pot at O'Grady's girlfriend's home.

According to defendant, he and O'Grady left the girlfriend's home and went to a bar, where defendant claimed he got "really[,] really[,] really drunk." They stayed at the bar until closing, sometime after 2:00 a.m., and defendant claimed that by that time, he was vomiting and stumbling. Defendant said he and O'Grady then went back to O'Grady's girlfriend's home.

Defendant explained he and O'Grady later went to Ms. Bostian's house. Defendant said he had been told by his estranged wife, Naomi Frey, about Counterman's safe at Ms. Bostian's home, and that it contained "a lot of money." Defendant explained he and O'Grady had been talking about the safe that night.

Defendant claimed he laid down in the yard outside Ms. Bostian's house while O'Grady entered through the front window. Defendant said he passed out, and when O'Grady woke him up, O'Grady had the safe in the yard and O'Grady wanted his help carrying it. Defendant told Lieutenant Speirs he had been in the yard "barfing," and he could not pick up the safe because he was too drunk and had an arm injury.

Defendant also said O'Grady stole Ms. Bostian's car, and he helped O'Grady get the safe into the vehicle. They then drove the safe into the woods

in Pennsylvania and threw it from the vehicle. A few days later, they returned to the safe, and he helped O'Grady open it.

Defendant also said O'Grady gave him about $2,000. When asked about the money in the sock in the woods where he was arrested, defendant initially claimed the sock contained only a couple hundred dollars he had earned working, but he later admitted the money was from the safe.

During his statement, defendant also discussed the medallion found on the floor of Ms. Bostian's home. Defendant explained that on the day following the murder, he spoke with his sister, who told him the police found his hammer medallion at the murder scene. In his statement to Lieutenant Speirs, defendant said he told his sister that his hammer medallion was in his jewelry box at his home, and that it had a "black leather strap on it." When asked how long his medallion has been in his jewelry box, defendant said, "like a month maybe."

Rachel Glester testified defendant and O'Grady were at her house sometime after 10:30 p.m. on August 17, 2006, and that defendant was celebrating his birthday and wanted to get drunk. She did not see defendant wearing a hammer medallion that night, however, she did not look under his shirt to see if he was wearing it.

11

O'Grady's girlfriend, Donna Cassidy, testified she saw defendant and O'Grady around midnight on August 17, 2006. They were in front of her house drinking and getting ready to go to the bar. When she spoke with them, they did not appear drunk.

Tara Dreitlein testified she saw the defendant and O'Grady at the bar on August 18, 2006. She said defendant was not falling down or vomiting and did not otherwise appear drunk. She testified defendant and O'Grady left the bar around 2:00 a.m.

Erik Abel, a patron at the bar, also saw defendant and O'Grady in the early morning hours of August 18, 2006. He saw them drinking but testified neither appeared drunk. According to Abel, when they left the bar at 2:00 a.m., they appeared to be walking normally.

Deputy Chief Richard Dalrymple of the Warren County Prosecutor's Office testified that the distance between the bar and where Donald O'Grady lived was three-tenths of a mile. The distance between O'Grady's residence and Ms. Bostian's home was one-and-six-tenths of a mile.

Robin O'Grady testified that in August 2006, defendant had been working in Pennsylvania with Donald O'Grady, and Donald O'Grady's son, Donald O'Grady III. Robin O'Grady testified August 17, 2006, was defendant's

12

birthday. She baked him a cake to celebrate and expected him to come home that evening after work, but she did not see him until he returned before daylight the following morning. Robin O'Grady testified that when defendant came into their bedroom, he appeared anxious and she could tell he had been drinking, but he could walk and was not vomiting.

Defendant gave Robin O'Grady $800 and told her he had robbed someone. He then went to sleep. Robin O'Grady explained that after he woke up, defendant became upset while watching the news, which described a murder that had taken place that morning. Robin O'Grady testified defendant told her he robbed that house with Donald O'Grady. He told her it was his "wife's boyfriend's mother's house," and he had been in the house. According to Robin O'Grady, defendant said that although he robbed the house, "he did not hurt that lady." He told her he "took the safe and [O'Grady] was with the lady." Robin O'Grady told defendant to leave, and she did not see him until a couple of days later when he returned with Donald O'Grady.

Robin O'Grady testified that when they returned, they both had money. Defendant told her they had gotten the money from "wherever they stashed the money together." Robin O'Grady also testified defendant said their plan was to "take off." Robin O'Grady did not see defendant again until she traveled to the

13

Pennsylvania motel where he was staying with Donald O'Grady. She traveled to the motel with another woman to see defendant, and, while they were there, defendant and O'Grady were drinking and getting tattoos.

Robin O'Grady further testified that the police searched her home on August 25, 2006, and she gave them the Thor's hammer medallion belonging to defendant that was in her jewelry box. She testified that although she gave police the medallion that was kept in the jewelry box, defendant had more than one Thor's hammer medallion.

Following his arrest in Pennsylvania on charges related to Ms. Bostian's murder, defendant waived extradition to New Jersey. At his extradition hearing, an attorney with the Pennsylvania Office of the District Attorney stated "[t]here are no charges pending against [defendant] in Northampton County," despite the fact defendant had been arrested on a warrant for burglary in Bangor, Pennsylvania.

The record, however, reflects that charges related to the burglary were filed against defendant. On January 25, 2011, five years after defendant's arrest for the Pennsylvania burglary and two years after defendant's first trial in New Jersey, the District Attorney in Northampton County, Pennsylvania entered a nolle prosequi dismissal of charges against defendant stemming from the 2006

burglary in Bangor, Pennsylvania. The order dismissing the charges states that the basis for the nolle prosequi was that there was insufficient evidence to proceed.

As noted, the Pennsylvania burglary occurred on July 7, 2006, and the police report included in defendant's appendix on appeal states that a red hooded sweatshirt, a pair of shoes, and other evidence was taken. Five years later, in 2011, when the Bangor police department tried to locate the evidence for the scheduled trial on the burglary charge, they were unable to find the evidence.

The 2011 Pennsylvania court order dismissing the burglary charge refers to a "letter dated 1/20/11" as support for the court's finding there was insufficient evidence to support the prosecution. The January 20, 2011 letter is from Officer Michael Hunsicker of the Bangor Police Department to Assistant District Attorney Filingo. Hunsicker's letter states, "Officer Pickens and I[,] after several checks[,] have been unable to locate relevant evidence required for a[n] upcoming trial of Thor Frey 06-088897."

Prior to defendant's 2013 retrial on the charges arising from Ms. Bostian's murder, the court held a hearing on defendant's motion to suppress his 2006 recorded interrogation with Lieutenant Speirs. Defendant argued that the arrest warrant issued in Pennsylvania, "upon which the State based the arrest of

[defendant]," was a pretext to place defendant in custody and interrogate him in then-ongoing New Jersey homicide investigation. Defendant claimed that because the Commonwealth of Pennsylvania did not prosecute the burglary charges against him, and a nolle prosequi was entered in 2011, his arrest was founded on a "sham" warrant, and, for that reason, his statements should be suppressed.

The trial court rejected defendant's argument, finding the police arrested defendant on a valid warrant issued by a Pennsylvania court. The court found defendant failed to demonstrate the arrest warrant was void ab initio, and therefore failed to establish his arrest was unlawful. The court noted that we affirmed the order denying defendant's motion to suppress his statement to Lieutenant Speirs on the direct appeal from defendant's first conviction, see Frey I, slip op. at 21, and the court found the 2011 dismissal of the Pennsylvania burglary charge did not provide a basis to reconsider the denial of defendant's suppression motion. The court found defendant's Pennsylvania charges were "nol-prossed some three-and-a-half years after this arrest" and did not have "any relevance to the arrest at the time which was the subject of a valid arrest warrant [for] which probable cause had been found by a Pennsylvania judge." The court denied defendant's suppression motion.

A-4294-19

As noted, defendant's second trial resulted in his conviction on all counts in the indictment. The court entered the judgment of conviction on April 10, 2013.

In affirming defendant's conviction following his retrial, we rejected his claim the court erred by denying his motion to suppress his recorded statement. Frey II, slip. op. at 23. We determined that because "[d]efendant did not present any challenge to the Pennsylvania magistrate's finding of probable cause . . . there was no basis to conclude the Pennsylvania arrest warrant was invalid" at the time of defendant's 2006 arrest. Ibid.

Defendant filed a pro se PCR petition on September 27, 2017. The verified petition generally asserted defendant was entitled to a new trial based on his claim that newly discovered evidence – the January 20, 2011 Hunsicker letter purportedly demonstrating the Pennsylvania arrest warrant was based on false information – had been withheld prior to the suppression hearing and retrial. Defendant also alleged a Brady violation, asserting the January 20, 2011 letter had been requested "many times but was stated not to exist."[4]

---

[4] Documents included in defendant's appendices on appeal reflect numerous efforts to obtain documents related to the proceedings in the Pennsylvania burglary charge case from his Pennsylvania counsel and other Pennsylvania authorities.

In 2019, following the appointment of counsel, defendant submitted a certification in support of his PCR petition. Defendant asserted his trial counsel was ineffective by failing to introduce at his retrial a Thor's hammer medallion defendant claimed he had at the time of his 2006 arrest. He asserted that in "2006 or 2007" he gave the medallion to his counsel during a visit while incarcerated in the Warren County Jail.[5] Defendant claimed his counsel was ineffective by failing to introduce the medallion at the retrial because, according to defendant, introduction of the medallion would have resulted in an acquittal.[6]

The PCR court heard argument on defendant's petition. The court interpreted defendant's initial 2017 PCR filling as a motion for a new trial based on newly discovered evidence. In its written opinion, the PCR court found defendant's arguments as to "newly discovered evidence" based on the 2011

---

[5] Defendant's certification supporting his PCR petition states he first gave the medallion to his counsel in 2006 or 2007, and his counsel gave the medallion to defendant's friend, Janet Ecker, after defendant's first trial. Ecker submitted a certification stating she was given the medallion by defendant's counsel after defendant was "convicted at trial," and she later gave the medallion to defendant's brother Michael Merlo. According to defendant, Merlo retained the medallion until 2019. Merlo certified he gave the medallion to counsel who represented defendant on the PCR petition in the Law Division.

[6] Defendant also asserts the same counsel was ineffective by failing to introduce the medallion at the first trial. We do not address the claim because we reversed defendant's conviction at the first trial. Frey I, slip op. at 21.

Pennsylvania dismissal order had been addressed by this court in Frey II, and would not "be modified." See Frey II, slip op. at 19-23 (rejecting defendant's claim the court erred by denying his motion to suppress his statement based on the 2011 dismissal of the Pennsylvania burglary charge).

The court also rejected defendant's claim his counsel was ineffective by not introducing into evidence at trial the medallion defendant claims he wore when he was arrested. The court noted the conflicting evidence concerning the "provenance" of the medallion found at the scene and defendant's statements implicating himself in the burglary and acknowledging his presence at the scene, and the court explained defendant's conviction for felony murder did not require proof of defendant's presence inside Ms. Bostian's home. The court entered an order denying the PCR petition. This appeal followed.

On appeal, defendant's counsel makes the following argument:

> POINT I
>
> THIS MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANT ESTABLISHED A PRIMA FACIE CASE OF TRIAL COUNSEL'S INEFFECTIVENESS FOR FAILING TO PRESENT EXCULPATORY EVIDENCE.

In defendant's pro se supplemental brief, he argues:

POINT I

THE PCR COURT REACHED AN UNREASONABLE DECISION DUE TO ITS MISINTERPRETATION OF THE FACTS OF THE CASE AND ITS IMPROPER RELIANCE ON PRIOR DECISIONS FROM THE APPELLATE DIVISION IN THIS CASE. THEREFORE, THE PCR COURT ERRED BY NOT GRANTING THE DEFENDANT A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE, PURSUANT TO N.J.Ct.R. 3:20-2; OR IN THE ALTERNATIVE, AN EVIDENTIARY HEARING TO DEVELOP THE FACTS FOR INEFFECTIVE ASSISTANCE OF COUNSEL, PURSUANT TO N.J.Ct.R. 3:22-2(e).

POINT II

THE STATE'S FAILURE TO DISCLOSE THE HUNSI[C]KER REPORT PRIOR TO DEFENDANT'S SECOND TRIAL CONSTITUTES A VIOLATION OF BRADY AND BAGLEY. THE PCR JUDGE ERRED BY SPECULATING THAT THE PENNSYLVANIA PROSECUTOR'S OFFICE MADE A "PROCEDURAL CHOICE" NOT TO PROSECUTE THE PENNSYLVANIA CASE; THEREFORE[,] THE DENIAL OF THE DEFENDANT' S PETITION FOR POST-CON[V]ICTION RELIEF MUST BE VACATED.

POINT III

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE AND OBTAIN A COPY OF THE HUNSICKER POLICE REPORT PRIOR TO THE DEFENDANT'S SECOND SUPPRESSION HEARING ON THE EVIDENCE AND STATEMENT OBTAINED PURSUANT TO AN

ILLEGAL ARREST IN PENNSYLVANIA. COUNSEL'S DEF[]ICIENT PERFORMANCE ALLOWED EVIDENCE THAT SHOULD HAVE BEEN SUPPRESSED TO BE PRESENTED TO THE JURY, WHICH PREJUDICED THE DEFENDANT'S DUE PROCESS AND FAIR TRIAL RIGHTS. COUNSEL'S INACTION VIOLATED THE DEFENDANT'S STATE AN[D] FEDERAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AS EXPLAINED IN STRICKLAND/FRITZ; AND GUARANTEED UNDER THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I, PARAGRAPH 10 OF THE NEW JERSEY CONSTITUTION. THEREFORE, THE PCR COURT ERRED IN FINDING THAT THE DEFENDANT IS NOT ENTITLED TO A NEW TRIAL TO CORRECT THESE CONSTITUTIONAL VIOLATIONS.

POINT IV

THE DEFENDANT ESTABLISHED A PRIMA FACIE CASE FOR BRADY/BAGLEY VIOLATIONS AND INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL. THE PCR COURT ERRED BY NOT GRANTING ORAL ARGUMENT IN AN EVIDENTIARY HEARING TO DETERMINE THE MERITS OF THE CONTENTIONS RAISED IN THE DEFENDANT'S PETITION, PURSUANT TO N.J.Ct.R. 3:22-10(b).

II.

We review the legal conclusions of a PCR court de novo. State v. Harris, 181 N.J. 391, 419 (2004). The de novo standard of review also applies to mixed questions of fact and law. Id. at 420. Where, as here, an evidentiary hearing

21

has not been held, it is within our authority "to conduct a de novo review of both the factual findings and legal conclusions of the PCR court." Id. at 421. We apply these standards here.

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee that a defendant in a criminal proceeding has the right to the assistance of counsel in his or her defense. The right to counsel includes "the right to the effective assistance of counsel." State v. Nash, 212 N.J. 518, 541 (2013) (quoting Strickland v. Washington, 466 U.S. 668, 686 (1984)).

In Strickland, the Court established a two-part test, later adopted by our Supreme Court in State v. Fritz, as the standard under our state constitution, to determine whether a defendant has been deprived of the effective assistance of counsel. Strickland, 466 U.S. at 687; Fritz, 105 N.J. 42, 58 (1987). Under the first prong of the Strickland standard, a petitioner must show that counsel's performance was deficient. It must be demonstrated that counsel's handling of the matter "fell below an objective standard of reasonableness" and that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687-88.

Under the second prong of the Strickland standard, a defendant "must show that the deficient performance prejudiced the defense." Id. at 687. There must be a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A petitioner must demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. "The error committed must be so serious as to undermine the court's confidence in the jury's verdict or result reached." State v. Chew, 179 N.J. 186, 204 (2004) (citing Strickland, 466 U.S. at 694).

"With respect to both prongs of the Strickland test, a defendant asserting ineffective assistance of counsel on PCR bears the burden of proving his or her right to relief by a preponderance of the evidence." State v. Gaitan, 209 N.J. 339, 350 (2012) (citing State v. Echols, 199 N.J. 344, 357 (2009); State v. Goodwin, 173 N.J. 583, 593 (2002)). A failure to satisfy either prong of the Strickland standard requires the denial of a petition for PCR. Strickland, 466 U.S. at 700; Nash, 212 N.J. at 542; Fritz, 105 N.J. at 52.

A.

Defendant claims counsel was ineffective by failing to introduce at trial the hammer medallion defendant claims he wore at the time of his arrest in

Pennsylvania and later gave to his counsel while incarcerated in "2006 or 2007" in the Warren County jail. Defendant argues the recovery of the medallion in Ms. Bostian's home constituted critical evidence purportedly linking him to the crime scene, and his counsel should have introduced at trial the medallion he asserts he was wearing when he was arrested because it would have established the medallion recovered at the scene was not his. According to defendant, establishing the medallion recovered at the scene was not his would have undermined the State's claim he entered the home in which Ms. Bostian was murdered.

In the analysis of a PCR petition, a court is required to accept the facts supported by competent evidence in the light most favorable to defendant. State v. Jones, 219 N.J. 298, 311 (2014). Here, for purposes of our consideration of defendant's petition, we accept his certified statements he wore a hammer medallion at the time of his arrest in Pennsylvania; he gave the medallion to his counsel after his extradition to New Jersey and while he was incarcerated in Warren County; and his attorney did not introduce the medallion during the retrial that resulted in his conviction.

We recognize that, when viewed in isolation, evidence showing defendant was in possession of a hammer medallion at the time of his arrest arguably

24

undermines the State's claim the medallion recovered in Ms. Bostian's home belonged to defendant. The PCR court, however, correctly rejected defendant's claim his trial counsel was ineffective by failing to introduce the medallion defendant asserts he wore when he was arrested because defendant failed to establish either prong of the Strickland standard.

Under Strickland's first prong, we must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." State v. Pierre, 223 N.J. 560, 579 (2015) (alteration in original) (quoting Strickland, 466 U.S. at 689). "[C]omplaints 'merely of matters of trial strategy' will not serve to ground a constitutional claim of inadequacy of representation by counsel." Fritz, 105 N.J. at 54 (citation omitted). "Because of the difficulties inherent" in assessing an attorney's performance at trial, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (citation omitted).

A-4294-19

We consider defendant's claim his counsel's decision not to introduce the medallion "fell below an objective standard of reasonableness" based on all of the circumstances presented. Strickland, 466 U.S. at 688, 690. That is because "'[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of decisions regarding how best to represent a criminal defendant.'" State v. Allegro, 193 N.J. 352, 366 (2008) (alteration in original) (quoting State v. Castagna, 187 N.J. 293, 314 (2006)).

The record shows counsel was confronted at trial with defendant's detailed statement admitting he informed O'Grady about the safe at Ms. Bostian's house, and, further, that he went to the house with O'Grady, helped O'Grady with the safe after O'Grady allegedly moved it out of the house on his own, fled the scene with O'Grady, and then shared in the proceeds of the burglary and robbery. Moreover, trial counsel was confronted with other similarly overwhelming evidence of defendant's involvement in the burglary and robbery, including: the witnesses who saw defendant and O'Grady together during the hours immediately preceding the burglary and robbery; defendant's admissions to Robin O'Grady that he and O'Grady robbed Ms. Bostian; the recovery of cash from the sock found near defendant when he fled; and the proximity of the stolen

safe to the motel where defendant and O'Grady stayed after Ms. Bostian's murder.

The trial record makes clear that, confronted with the substantial evidence against defendant, counsel employed a strategy of attempting to limit defendant's exposure to convictions only for theft offenses only and minimizing defendant's risk of conviction for the more serious offenses of burglary and robbery which, due to Ms. Bostian's death, also exposed defendant to a conviction for felony murder. See N.J.S.A. 2C:11-3(a)(3). As the record makes plain, the vehicle for that strategy was defendant's detailed statement to Lieutenant Speirs in which defendant offered a version of the events which, if accepted by the jury, provided at least an arguable basis for the jury to convict defendant of theft offenses only, but not burglary, robbery, and felony murder.

Trial counsel relied on defendant's statement to convey defendant's version of the events as a means of presenting a defense to the most serious charges without exposing defendant to the rigors of cross examination and challenges to his credibility based on his prior criminal convictions.[7] And,

---

[7] The transcript of defendant's April 10, 2013 sentencing proceeding reflects that the State presented the court with certified New Jersey state court judgments for the following: September 5, 1990 convictions for two counts of third-degree burglary; September 5, 1990 conviction for theft; November 9, 1990 convictions

consistent with that strategy, trial counsel argued to the jury that "every word of" defendant's statement to Lieutenant Speirs was true; the statement should be accepted; and the statement did not permit convictions for the most serious crimes, including burglary, robbery, and felony murder. See Frey I, slip op. at 18-19 (explaining jury instructions concerning theft charges were "clearly indicated" by defendant's statement to Speirs, and noting that if defendant had been successful in suppressing his statement, the record would have lacked evidence supporting a jury charge on the lesser-included theft offenses).

---

for fourth-degree conspiracy and fourth-degree uttering a forged document; November 9, 1990 conviction for third-degree burglary; May 22, 1992 convictions for third-degree burglary and two counts of third-degree theft; March 24, 1995 conviction for simple assault; February 22, 1996 conviction for third-degree burglary; July 26, 1996 conviction for third-degree receiving stolen property, May 15, 1997 conviction for third-degree receiving stolen property; October 5, 1999 conviction for third-degree burglary; October 15, 1999 conviction for third-degree receiving stolen property; October 15, 1999 conviction for fourth-degree unlawful taking of a means of conveyance; October 15, 1999 convictions for third-degree theft by deception and fourth-degree fraudulent use of a credit card; October 15, 1999 convictions for four counts of third-degree burglary; February 25, 2005 convictions for third-degree conspiracy to commit burglary, third-degree burglary, and third-degree theft; July 8, 2005 convictions for third-degree conspiracy to commit burglary and third-degree burglary. See generally State v. Brunson, 132 N.J. 377, 391 (1993) (explaining where a defendant "has been convicted of a crime that is the same or similar to the offense charged," the conviction is admissible but is "limited to the degree of the crime and the date of the offense but excluding any evidence of the specific crime of which [the] defendant was convicted"); see also N.J.R.E. 609 (permitting admission, under certain circumstances, of a witness's prior convictions of a crime for the purpose of attacking the witness's credibility).

Defendant did not argue before the PCR court, and does not argue on appeal, that his counsel's trial strategy in relying on his statement to Lieutenant Speirs fell "outside the wide range of professionally competent assistance" required of constitutionally effective counsel, or "fell below an objective standard of reasonableness." See Strickland, 466 U.S. at 688-90. And we find no basis in the record to conclude it was.

"The quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of guilt." Castagna, 187 N.J. at 314. Defendant's myopic focus on the medallion, however, ignores the other substantial evidence against him, as well as the fact that he would have been compelled to testify at trial in order to support the admission of the medallion. Further, introduction of the medallion would have undermined defendant's reliance on his statement to Lieutenant Speirs to convey his version of the events supporting only a conviction for the theft offenses. Trial counsel was able to argue to the jury that every word of defendant's statement to Lieutenant Speirs was the "truth," but admission of the medallion would have rendered false defendant's statement that his medallion was in a jewelry box at his home and had been there for a month. That statement made by defendant to Lieutenant

29

Speirs was supported by the evidence establishing that a hammer medallion was recovered from the jewelry box in the home defendant shared with Robin O'Grady. To have admitted the medallion at trial would have required that defendant admit he lied to Lieutenant Speirs. Defendant fails to demonstrate how his counsel's decision not to put him in that position by introducing the medallion demonstrated counsel's performance was deficient under the first prong of the Strickland standard. See Strickland, 466 U.S. at 687.

Defendant also overstates the evidentiary value of his alleged possession of a hammer medallion at the time of his arrest. The evidence presented at trial permitted counsel to argue that the medallion defendant was photographed wearing three weeks before the murder was different in appearance to the one recovered in Ms. Bostian's house. That evidence undermined the State's claim the medallion found in Ms. Bostian's home was defendant's. Additionally, there was overwhelming evidence independent of the medallion establishing defendant's presence at the scene, including his detailed statement to Lieutenant Speirs, his admissions to Robin O'Grady, his prior knowledge of Counterman's safe through his estranged wife, his participation in financial rewards of his and Donald O'Grady's crimes against Ms. Bostian, and the evidence showing the great weight of the safe required two people to carry out of Ms. Bostian's home.

A-4294-19

Further, as the PCR court recognized, the medallion may have supported a finding defendant entered Ms. Bostian's house, but the State did not need to prove defendant's entry to support his conviction the offenses charged.

In sum, we are convinced the court correctly determined defendant failed to satisfy Strickland's first prong. For that reason alone, we affirm the court's denial of defendant's PCR claim that his counsel was ineffective by failing to introduce the medallion at trial. See Strickland, 466 U.S. at 700 (explaining a failure to satisfy either prong of the Strickland standard requires the denial of a petition for PCR); see also Nash, 212 N.J. at 542 (same). We also affirm the court's order denying the claim because, even assuming counsel erred by failing to introduce the medallion, defendant failed to establish that but for the error there is a reasonable probability the result of his trial would have been different. Strickland, 466 U.S. at 694.

"One important factor in analyzing whether the prejudice from counsel's [alleged] ineffective performance denied [a defendant] a fair trial is the strength or weaknesses of the State's case." State v. Hannah, 248 N.J. 148, 188 (2021). As we have explained, defendant overstates the significance of the proposed evidence that he possessed a medallion when it is considered in the context of the other overwhelming evidence of his involvement in the burglary and robbery

31

that culminated in Ms. Bostian's murder. "[A] conviction is more readily attributable to deficiencies in defense counsel's performance when the State has a relatively weak case than when the State has presented overwhelming evidence of guilt," State v. Gideon, 244 N.J. 538, 557 (2021), but that is not the case here.

Defendant makes no showing there is a reasonable probability that introduction of the medallion would have changed the result of his trial, and, for the reasons noted, we are persuaded introduction of the medallion would have actually undermined counsel's well-reasoned trial strategy. See Allegro, 193 N.J. at 369-71 (explaining a defendant does not suffer prejudice under Strickland's second prong by counsel's decision not to introduce evidence harmful to the defense). Defendant had an affirmative duty to prove prejudice, Gideon, 244 N.J. at 551, and he failed to sustain that burden. The PCR court correctly rejected defendant's claim his counsel was ineffective by failing to introduce the medallion at trial.

B.

Defendant also makes various claims related to the January 20, 2011 letter from Bangor police officer Hunsicker to an Assistant Pennsylvania District Attorney stating he was unable locate the evidence supporting the Pennsylvania

burglary charge. As noted, the letter is cited in the Pennsylvania court's January 25, 2011 order dismissing the burglary charge for which defendant was arrested and in custody when Lieutenant Speirs obtained defendant's statement.

Defendant claims his counsel should have obtained the letter before the hearing on his motion to suppress his statement to Lieutenant Speirs that was conducted prior to the 2013 retrial. In that motion, defendant argued the Pennsylvania court's January 25, 2011 order dismissing the burglary charge established that his 2006 Pennsylvania arrest was based on an improperly obtained arrest warrant. He argued that because he was arrested in Pennsylvania on an invalid warrant, his statement to Lieutenant Speirs was obtained unconstitutionally and should be suppressed. See generally State v. Chippero, 164 N.J. 342, 353 (2000) (explaining a statement "obtained through custodial interrogation should" generally be suppressed if it is the result of an unlawful arrest and it is not "sufficiently attenuated" from the unlawful actions of the police).

As noted, the motion court rejected the argument and denied the suppression motion. We affirmed the defendant's conviction following his retrial, as well as the court's order denying defendant's suppression motion. Frey II, slip op. at 21-22. We determined defendant failed to present any evidence

demonstrating the 2006 Pennsylvania arrest was obtained without a proper finding of probable cause.  Id. at 23.

Defendant later obtained the January 20, 2011 letter referred to in the Pennsylvania dismissal order.  In his 2017 PCR petition, he asserted the letter constituted new evidence entitling him to a new trial.  He also asserted the State committed a Brady violation by failing to produce the letter.

The record is unclear as to whether the court interpreted defendant's 2017 PCR petition as a motion for a new trial based on newly discovered evidence under Rule 3:20-1 and -2.  There is colloquy among counsel and the court suggesting the court interpreted the 2017 petition as a motion for a new trial, and that the motion was denied at a time prior to the court's consideration of the PCR claims.  The record, however, does not include a transcript of any proceedings on such a motion or an order denying it.  In its written decision supporting its denial of PCR, the court also refers to defendant's 2017 petition as a "motion for a new trial based upon newly discovered evidence and [Brady] violations," but the court does not address the merits of the motion or otherwise indicate if it was previously decided.

Nonetheless, on appeal defendant argues the court erred:  by denying his motion for a new trial based on newly discovered evidence – the January 20,

2011 letter; by denying his PCR claim that the State violated his due process rights by failing to turn over the letter as <u>Brady</u> material; and by rejecting his claim his counsel was ineffective by failing to obtain the letter and use it to support the motion to suppress his statement prior to his retrial. We address each of these arguments, but note at the outset that none are persuasive.

We consider first defendant's claim his counsel was ineffective by failing to obtain the January 20, 2011 letter referred to in the Pennsylvania court's dismissal order prior to the hearing on the motion to suppress defendant's statement. As our Supreme Court has explained, "[a]lthough a demonstration of prejudice constitutes the second part of the <u>Strickland</u> analysis, courts are permitted leeway to choose to examine first whether a defendant has been prejudiced, and if not, to dismiss the claim without determining whether counsel's performance was constitutionally deficient." <u>Gaitan</u>, 209 N.J. at 350 (citation omitted). We choose to consider first the prejudice prong of the <u>Strickland</u> standard here.

In our view, defendant failed to satisfy the prejudice prong of the <u>Strickland</u> standard because he did not present any evidence establishing a reasonable probability that had his counsel obtained and presented the January 20, 2011 letter at the suppression hearing, the result of the suppression motion

would have been different. See Strickland, 466 U.S. at 687. Defendant claims the letter establishes there was no probable cause for the issuance of the 2006 arrest warrant, but the letter is wholly unrelated to the arrest warrant and the letter's contents do not establish the arrest warrant was a sham or was otherwise based on either false information or a lack of probable cause.

Indeed, defendant presents 2006 police reports from local Pennsylvania law enforcement officers detailing the evidence that was seized during the investigation of the burglary for which defendant was charged and arrested. The January 20, 2011 letter indicates nothing more than the evidence obtained in 2006 could not be located almost five years later. That the evidence could not be located five years after probable cause for the arrest was found by a Pennsylvania judge does not reasonably permit or allow the conclusion upon which defendant's PCR claim is based – that the affidavit submitted to obtain the 2006 arrest warrant was either false or did not support the Pennsylvania court's probable cause determination. Defendant makes no showing to the contrary. We therefore conclude any purported failure of trial counsel to obtain and introduce the letter at defendant's suppression hearing prior to the retrial did not result in prejudice under Strickland's second prong. The PCR claim based

A-4294-19

on counsel's alleged failure to obtain and introduce the letter was properly denied. See Strickland, 466 U.S. at 700; Gaitan, 209 N.J. at 350.

For the same reason, defendant's claim he is entitled to a new trial based on newly discovered evidence is devoid of merit. To obtain a new trial based on newly discovered evidence, a

> defendant must show that the evidence is 1) material, and not 'merely' cumulative, impeaching, or contradictory; 2) that the evidence was discovered after completion of the trial and was 'not discoverable by reasonable diligence beforehand'; and 3) that the evidence 'would probably change the jury's verdict if a new trial were granted.'
>
> [State v. Ways, 180 N.J. 171, 187 (2004) (quoting State v. Carter, 85 N.J. 300, 314 (1981)).]

Defendant's new trial motion is founded on the claim that had his counsel obtained the January 20, 2011 letter, his statement would have been suppressed, and that "would probably change the jury's verdict if a new trial was granted." As we have explained, however, we are not convinced there is even a reasonable probability that introduction of the letter at the suppression hearing would have resulted in suppression of defendant's statement. Thus, we discern no basis to conclude defendant was entitled to a new trial based on his recovery of the letter following his retrial. See Ways, 180 N.J. at 187 (explaining a defendant must

A-4294-19

satisfy all of the requirements under the <u>Carter</u> standard to obtain a new trial based on newly discovered evidence).

We are also not persuaded by defendant's claim he is entitled to either a new trial or PCR because of an alleged <u>Brady</u> violation. "In every criminal case the prosecution must disclose to the defendant all evidence that is material either to guilt or to punishment." <u>State v. Nelson</u>, 155 N.J. 487, 497 (1998). <u>See also</u> <u>Brady</u>, 373 U.S. at 87; <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). A failure to turn over such evidence is a violation of a defendant's due process rights. <u>State v. Russo</u>, 333 N.J. Super. 119, 133-34 (App. Div. 2000). To establish a <u>Brady</u> violation warranting a new trial or evidentiary hearing when claimed in a PCR petition, the "defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material." <u>Id.</u> at 134. Generally, establishing these three elements requires the submission of affidavits or certificates under <u>Rule</u> 1:6-6. <u>See</u> <u>State v. Szemple</u>, 247 N.J. 82, 101 (2021); <u>State v. Cummings</u>, 321 N.J. Super. 154, 170 (App. Div. 1999).

Establishing the first element, suppression by the prosecution, does not require proof the suppression occurred purposefully or inadvertently. <u>State v. Brown</u>, 236 N.J. 497, 518 (2019). Determining "whether the prosecution should

be understood to have suppressed evidence . . . depends on whether the prosecution actually or constructively possessed that evidence." Nelson, 155 N.J. at 498. "The Brady disclosure rule applies only to information of which the prosecution is actually or constructively aware." Ibid. Even where an individual trial prosecutor is not aware of exculpatory evidence, awareness for suppression purposes may be imputed from "some [other] arm of the state." Id. at 519.

Here, defendant failed to present any competent evidence the State possessed the January 20, 2011 letter, either actually or constructively, prior to his retrial. The letter was from a Pennsylvania police officer to a Pennsylvania Assistant District Attorney concerning evidence related to a five-year old Pennsylvania burglary charge. Defendant presented no competent evidence the letter was ever in the State's possession, and the record shows only that defendant later obtained the letter directly from law enforcement authorities in Pennsylvania. Thus, defendant failed to demonstrate the State suppressed the letter.

In considering whether the evidence was favorable under the second element required to establish a Brady violation, the Court has held that undisclosed information that "is merely cumulative or repetitious for the purpose for which it could have been used" fails to establish the second element. Carter,

85 N.J. at 313. We do not find the letter was either cumulative or repetitious for the limited purpose for which it could be reasonably used – to establish that in 2011 Officer Hunsicker was unable to locate the evidence in the 2006 burglary case.

The third element necessary to prove a Brady violation – that the evidence is material – "is satisfied if [the] defendant demonstrates that there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." Russo, 333 N.J. Super. at 134. Under this prong, "[t]he significance of the nondisclosure 'depends primarily on the importance of the [evidence] and the strength of the State's case against [a] defendant as a whole.'" Brown, 236 N.J. at 520 (second and third alteration in original) (quoting State v. Marshall, 123 N.J. 1, 200 (1991)). Again, as we have explained, defendant failed to demonstrate the letter would have had an impact on the disposition of the suppression motion, and, as a result, he did not establish the letter would have affected the outcome of his trial.

The record submitted in support of defendant's Brady claim lacks both the requisite proofs of suppression by the State and that the letter was material. The PCR court therefore correctly denied defendant's PCR claim founded on an alleged Brady violation and, to the extent his petition might be construed as a

motion for a new trial based on a <u>Brady</u> violation, the court properly denied that motion as well.

C.

Defendant also argues the court erred by denying his PCR claims without an evidentiary hearing. A court is required to conduct an evidentiary hearing on a PCR claim where defendant establishes a "prima facie case in support of post-conviction relief, a determination by the court that there are material issues of disputed fact that cannot be resolved by reference to the existing record, and a determination that an evidentiary hearing is necessary to resolve the claims for relief." <u>R.</u> 3:22-10(a). To establish a prima facie PCR claim, a "defendant must demonstrate a reasonable likelihood that his or her claim, viewing the facts alleged in the light most favorable to the defendant, will ultimately succeed on the merits." <u>Ibid.</u>; <u>see also</u> <u>State v. Preciose</u>, 129 N.J. 451, 462-63 (1992).

Having failed to present evidence establishing a prima facie claim of ineffective assistance of counsel and of a denial of due process based on the State's alleged withholding of <u>Brady</u> material, defendant was not entitled to an evidentiary hearing. We therefore affirm the court's order denying defendant's PCR claims without an evidentiary hearing.

41

To the extent we have not expressly addressed any of defendant's remaining arguments, we find they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). Our decision on the merits of defendant's PCR claims also renders it unnecessary to address the State's argument defendant's PCR petition is untimely under Rule 3:22-12.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

42                                                                    A-4294-19